Michael J. DeBenedictis, Esq.
**DEBENEDICTIS & DEBENEDICTIS LLC**
20 Brace Road
Suite 350
Cherry Hill, NJ 08034

*Attorneys for Plaintiff*
*& Proposed Class*

*[Additional Counsel listed on signature page]*

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE FLETCHER, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>DR. PEPPER SNAPPLE GROUP, INC., DR. PEPPER/SEVEN UP, INC.<br><br>        Defendants. | No.: _____<br><br>**Class Action Complaint**<br><br>**Jury Trial Demanded** |

## <u>INTRODUCTION</u>

1.      Plaintiff Julie Fletcher, by and through her counsel, brings this class action against DPSG Dr. Pepper Snapple Group, Inc., and Dr. Pepper/Seven Up, Inc., ("DPSG") on behalf of herself, the general public, and those similarly situated for violations of New York General Business Law ("NYGBL) § 349, violations of NYBL § 350, common law fraud, deceit and/or misrepresentation, breach of express and implied warranties, and unjust enrichment/restitution. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.      This case concerns DPSG's false and deceptive labeling, advertising, marketing, and sale of the soft drink, Canada Dry Ginger Ale, as "MADE FROM REAL GINGER." This representation leads consumers to reasonably believe that DPSG's soft drink is made using real ginger root—i.e., the spice made by chopping or powdering the root of the ginger plant,[1]—and that consumers who drink the soft drink will receive the health benefits associated with consuming real ginger.

3.      In truth, DPSG's soft drink is not made from real ginger. Instead, Canada Dry Ginger Ale is made from carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a flavor compound comprised predominately of flavor extracts not derived from ginger, and a miniscule amount of a ginger flavor extract. But Canada Dry's ginger flavor extract is not "real ginger" as reasonable consumers understand that term. It is manufactured in a lab using various chemicals and extraction processes. And, although the flavor extract contains some ginger compounds, the miniscule amount that DPSG uses to make Canada Dry results in less than **two parts per million** of any ginger compounds in the final beverage. This microscopic amount of ginger flavor extract provides none of the health benefits consumers

---

[1] *See*, https://en.oxforddictionaries.com/definition/ginger (last visited Mar. 6, 2017) (defining "ginger" as "(1) a hot, fragrant spice made from the rhizome of a plant, which may be chopped or powdered for cooking, preserved in syrup, or candied; (2) a SE Asian plant, which resembles bamboo in appearance, from which ginger is taken."); https://en.oxforddictionaries.com/definition/rhizome (defining "rhizome" as "A continuously growing horizontal underground stem which puts out lateral shoots and adventitious roots at intervals); *see also* https://en.wikipedia.org/wiki/Ginger (last visited Mar. 6, 2017) ("Ginger (Zingiber officinale) is a flowering plant whose rhizome, ginger root or simply ginger, is widely used as a spice or a folk medicine.")

associate with real ginger and even appears to fall below the threshold concentration required to impart any flavor to the beverage.[2]

4.      Throughout the Class Period, DPSG prominently made the claim "MADE FROM REAL GINGER" on the front label panel of all of its Canada Dry Ginger Ale cans and bottles because its marketing research revealed that the claim would cultivate a wholesome and healthful image for Canada Dry and promote the sale of its soft drink in a market environment where consumers were fleeing "regular" sodas due to increasing concerns about the health problems they cause. DPSG called this labeling change its real ginger "renovation," and it proved highly successful. Within six months of adding the claim, Canada Dry sales skyrocketed by almost 9%, and continued to increase every year thereafter—even with sales of regular sodas continuing to decline. DPSG's own market research has attributed this success to the "Made from Real Ginger" claim, and consumers' perception of the beverage as a healthier alternative to regular soda because they believe it is "made with real ginger."  DPSG' misrepresentations have misled millions of consumers and caused them to pay a premium for Canada Dry beverages.

## PARTIES

5.      Julie Fletcher is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Bolivar, New York.

6.      Defendant Dr. Pepper Snapple Group, Inc. is a corporation existing under the laws of the State of Delaware, having its principal place of business in Plano, Texas.

---

[2] *See* Fletcher, C. and Scott T., Food Flavours Biology and Chemistry (1997) (noting that the minimum human taste threshold for ginger compounds is a concentration between seven and seventeen parts per million).

7.      Defendant Dr. Pepper/Seven Up, Inc is a corporation existing under the laws of the State of Delaware, having its principal place of business in Plano, Texas. It is a wholly-owned subsidiary of Dr. Pepper Snapple Group, Inc.

8.      The Parties identified in paragraphs 6–7 of this Class Action Complaint are collectively referred to hereafter as "DPSG."

9.      At all times herein mentioned, each of the defendants was the agent, servant, representative, officer, director, partner or employee of the other defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

10.     At all times herein mentioned, each of the defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

11.     At all times herein mentioned, the acts and omissions of each of the defendants concurred and contributed to the various acts and omissions of each and all of the other defendants in proximately causing the injuries and damages as herein alleged.

12.     At all times herein mentioned, each of the defendants ratified each and every act or omission complained of herein.

13.     At all times herein mentioned, each of the defendants aided and abetted the acts and omissions of each and all of the other defendants in proximately causing the damages, and other injuries, as herein alleged.

### JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which at least one member of the class is a citizen of a State different from DPSG.

15.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by DPSG within, affecting, and emanating from, the State of New York. DPSG intentionally advertised Canada Dry in the state of New York, representing that it was "MADE FROM REAL GINGER" and distributed products to New York knowing they would be sold at retail to consumers such as Plaintiff Fletcher. Plaintiff Fletcher purchased Canada Dry in the state of New York based on DPSG's misrepresentations.

16.     DPSG regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of New York. Indeed, DPSG describes New York as part of its "heartland" for sales of Canada Dry.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of New York, including within this District.

## SUBSTANTIVE ALLEGATIONS

18.     DPSG manufactures, distributes, markets, advertises, and sells soft drinks in the United States under several brand names, including "Canada Dry." DPSG's packaging for the following varieties of Canada Dry Ginger Ale predominately, uniformly, and consistently state on the principal display panel of the product labels that they are "MADE FROM REAL GINGER" (referred to collectively herein as "Canada Dry" or the "Products"):

    a)  Ginger Ale;

    b)  Ginger Ale – Made With Real Sugar;

    c)  Diet Ginger Ale;

    d)  Blackberry Ginger Ale;

    e)  Cranberry Ginger Ale; and

    f)  Diet Cranberry Ginger Ale;

19.    The representation that the Products are "MADE FROM REAL GINGER" was uniformly communicated to Plaintiffs and every other person who purchased any of the Products in New York. An exemplar of each of the Products' product label is attached hereto as Exhibit A.

20.    As described in detail below, DPSG's advertising and labeling of the Products, as "MADE FROM REAL GINGER" is false, misleading, and intended to induce consumers to purchase Canada Dry, at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that the Products are made using ginger root— i.e., the spice made by chopping or powdering the root of the ginger plant—and not miniscule amounts of flavoring "extracts."

21.    In fact, Canada Dry is not made from real ginger. Instead, it is made from carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a flavor compound comprised predominately of flavor extracts not derived from ginger, and a miniscule amount of a ginger flavor extract.

## A.    DPSG Researched and Undertook a Real Ginger Marketing "Rennovation"[3]

---

[3] Unless otherwise indicated, quotations in this section are to DPSG's own internal marketing materials that were filed publicly in a similar class action currently pending in the Northern District of California, *Jackie Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, Case No. 5:17-cv-00564-NC (ECF No. 185 and exhibits attached thereto). The Court in that case granted certification of a class of California purchasers on June 27, 2018. *See id.*, ECF No. 199.

22.     Manufacturers of carbonated soft drinks ("CSDs") such as DPSG have come under fire from public health advocates over the past decade. Their products, which offer empty calories from high fructose corn syrup, are largely responsible for the obesity crisis in America and the increased prevalence of sugar-induced diabetes. According to the federal government, sweetened beverages like sodas are responsible for 47% of all added sugar in the American diet, representing by far the biggest source. U.S. Department of Health and Human Services and U.S. Department of Agriculture, 2015–2020 Dietary Guidelines for Americans 8th Edition, p. 54-55, available at http://health.gov/dietaryguidelines/2015/guidelines/ (accessed April 5, 2018). Independent market researchers and news agencies alike report that the health concerns surrounding CSDs have Big Soda "nearing the same enemy status that tobacco experienced years ago." Increasingly aware of these problems, consumers have been steadily abandoning CSDs and looking for healthier alternatives since the mid-2000s.

23.     Aware that sales of CSDs were declining, DPSG decided in mid-2007 it needed to market Canada Dry as a "better for you" ("BFY") alternative to regular soft drinks, even though it contains virtually the same amount of sugars from high fructose corn syrup driving the health criticism of "regular" sodas. DPSG understood that "Ginger triggers positive health perception with consumers" and "equates to healthy" because "Ginger has long been known to have many medicinal benefits." Its "vision" for Canada Dry was "to redefine what a CSD can be by delivering great taste and long term health benefits." Its "target" for Canada Dry would be the "healthy and wise consumer" who wanted to "embrace making healthy choices in everything they do." These were not consumers who were looking for a cure-all or to abandon unhealthy products altogether, but consumers who would "choose products that are the best fit for the healthy lifestyle even in 'unhealthy' categories." DPSG "objective" was to "increase purchase

frequency of Canada Dry by giving consumers a reason to make a healthy choice and stay in CSDs."

24.     However, DPSG' plan faced a snag: "most consumers don't think ginger ale has ginger in it." Indeed, DPSG' research showed that, at the time, nearly 2/3 of consumers did not believe ginger ale contained any ginger. DPSG would devote much thought, research, and planning into how to overcome this problem and bring forth its "vision."

25.     One of the first steps was a study in late 2007 to "provide a view into CSDs, health and nutrition, and how ginger fits into that scenario," and more specifically to "gather consumer language regarding ginger for future communication and research." The "one area that stood out" was "consumer interest in ginger and its health benefits." Based on this, DPSG thought the best way to bring forth its vision was "by reformulating the base product" to "put real ginger in the product, preferably organic" and become "a high-end ginger beverage that [would lead] the market on benefits and taste." The study further concluded that, in conjunction with the reformulation, DPSG should "tell a ginger story (on packaging, advertising, etc.)" to "communicate 'the power of ginger.'" Plans to change the formula to include real ginger were "discouraged immediately," however, because DPSG did not want to risk changing the taste of its beverage, which could hurt sales. As a result, DPSG decided it would just "tell a ginger story."

26.     In early 2008, DPSG considered telling its "ginger story" by adding "specific health claims" to Canada Dry "to realize the full potential of ginger's health benefits." However, DPSG was concerned that making direct health claims could present "regulatory/legal issues", and preferred that consumers simply infer health benefits by association with ginger. The problem was that most consumers at this time correctly believed that Canada Dry did not have

any real ginger in it. So DPSG could only obtain the aura of healthiness via-association with

ginger to "increase [Canada Dry's] 'Better for You' perception" by determining what message

would "resonate best" with consumers to convince them that Canada Dry had real ginger in it.

To this end, DPSG engaged in a "claimstorming" process with "creative consumers" and

conducted more market research to determine what claim or claims would work best.

27.     DPSG evaluated many "[p]hrases that increased interest," including "ginger

content," "healing," and the "functional benefits of ginger." It determined that "[p]hrases that

mention the ginger content of Canada Dry fare best among consumers, and in particular that

consumers "are motivated by references to 'real ginger'" and that "Real Ginger statements

resonated best.". Of those ginger content phrases tested, "Made from real ginger" had the highest

positive consumer association, followed closely by "made from three types of natural ginger."

These phrases created "strong appeal and PI [purchase intent] among consumers," with "'Made

from real ginger' [being] most appealing to consumers."

28.     DPSG's research showed that the phrase "Made from Real Ginger" was effective

because it caused consumers to perceive Canada Dry as a healthier beverage. According to

DPSG, "Made from Real Ginger" was a "powerful message" because it "Links Canada Dry to a

healthier option. Use of real ginger connotes health by virtue of existing associations with ginger

itself." DPSG also determined that "Canada Dry is 'Made from Real Ginger' is a powerful

message and consumers love it" because it "Provides New News. Not Everybody was aware that

Canada Dry Ginger Ale was made with real ginger." To put it another way, DPSG successfully

deceived people into believing, for the first time, that Canada Dry was made using ginger root,

even though it was not. As its research showed, "For many, the additional claims of 'made with

real ginger' and '100% natural flavors' were deemed relatively important and worth

communicating prominently on the pack – with greater required emphasis on 'made with real ginger' (greater perceived new news)." This deception also drove sales. DPSG's research shows that consumers "felt that they would consider drinking more CDGA based on its healthier message . . . made from real ginger" and that consumers had "increased purchase intent because it implied that Canada Dry Ginger Ale was healthier because it contained real ginger."

29.     DPSG summed up its decision to add "Made from Real Ginger" to its label in the following email: "Based on consumer research, we believe the most motivating/persuasive message is to inform consumers that CD has real ginger. Once they understand this, they will automatically make their own assumptions about the benefits. Focusing on the 'made from real ginger' keeps us free from any regulatory/legal issues as well." As such DPSG's marketing plan was to "grow sales of Canada Dry Ginger Ale" by communicating that "Canada Dry Ginger Ale is a CSD that fits into your healthy lifestyle because it is made from real ginger." Indeed, communicating "Discover Canada Dry Ginger Ale is made with REAL ginger" topped the list of DPSG's "communication hierarchy."

30.     Internally, DPSG referred to the addition of "Made from Real Ginger" to its label as its "Real Ginger Goodness Renovation." The "Renovation," which launched around July 2009, was a "Refresh of packaging graphics with a NEW healthier look that calls out 'Made From Real Ginger.'" It was a "Renovation" in marketing only—the product formula remained unchanged. It also included national TV advertising to emphasize the "'Made from Real Ginger' message." As of the "Renovation", "Made From Real Ginger" became Canada Dry's "key strategic message" to consumers, by which DPSG intended to convey "that Canada Dry Ginger Ale is made with real ginger, is natural, and is a better choice than other sodas."

**B.     DPSG's Real Ginger "Rennovation" Was Effective.**

31.     DPSG's real ginger "Renovation" had the desired effect. Just a few months after releasing its new package on the market, its sales volume was up over 8.5%. By contrast, in 2008, volume sales of Canada Dry had increased by only 1.4%. Indeed, DPSG acknowledged that its "Canada Dry Renovation 'made from real ginger' program is working." It delivered a strong "message relevant to the target consumer;" increased "consumer awareness and brand equity"; and increased "purchase frequency and volume growth." A survey DPSG conducted at the same time also determined that the "Renovation" was driving healthier perceptions of Canada Dry. Consumers provided "unaided expressions" in the "healthy category" about Canada Dry including "I know [soda]'s not good but this does have some benefits" and "made from real ginger."

32.     July 2010 research similarly concluded that the "'Real Ginger' message is working." Canada Dry sales grew by 13% in 2010, which DPSG attributed to its "Message is resonating." DPSG concluded again in 2011 that its "'Made from Real Ginger message and refreshed packaging graphics resonate with consumer driving baseline volume +10%", and again in 2014 that the "Real Ginger message is working!" "CDGA is up +8.1% YTD." Indeed, DPSG acknowledged the continued effectiveness of its 2009 "renovation" even in 2017, stating that "Canada Dry has been bucking CSD category trends, growing every year for the past 10 years, with +5% growth in 2016. The differentiating product attribute is ginger. Ginger provides the soothing and refreshing taste and allows people to feel less guilty about CD than other CSDs."

33.     DPSG was not the only one attributing Canada Dry's breakaway success from 2009 onwards to the "Made from Real Ginger" message. A 2013 report from Mintel, an independent marketing research firm, concluded that: "Brands like Canada Dry Ginger Ale have seen an increase in sales because of an emphasis on their natural ingredients."

34.     Similarly, the Burke research group conducted a survey at DPSG's behest in 2013 to answer: "Why do consumers drink Canada Dry?" It concluded that the top rated factor was "Natural/Healthy," and the top rated reasons within that factor were "Canada Dry is made with real ginger" and "I drink Canada Dry ginger ale because it is a healthier alternative to soft drinks." It also concluded that consumers ranked "Canada Dry is made with real ginger" as the most important factor impacting usage, and as the second highest factor correlated with purchase and consumption of Canada Dry, behind only brand loyalty. And, although the brand loyalty factor was the most highly correlated factor with consumption, the Burke study also determined that Canada Dry's brand image was itself "closely affiliated with many established Canada Dry brand equities," including both that "CD is made with real ginger" and that it is a "healthier alternative to soft drinks."

35.     Due to the success of the real ginger "Renovation," DPSG made "Real Ginger Messaging" its main priority throughout the class period and through today. The label and packaging remained the same throughout the class period. DPSG's marketing plan has also centered on reinforcing the "Real Ginger" message through various forms of advertising.

**C.     DPSG's Jack's Ginger Farm Ads were designed to Convince Consumers that Canada Dry is Made Using Real Ginger Root.**

36.     DPSG's real ginger "Renovation" included an advertising campaign designed to communicate the "Real Ginger Message" and to deceive consumers into believing that the Products are made using ginger root. Defendants broadcast their "Jack's Ginger Farm" television commercials throughout the United Sates (including New York) starting in 2011 and through 2016. All of these commercials depict Jack's Ginger Farm where workers or other people pull up ginger plants by the stalk to discover Canada Dry Ginger Ale where the ginger root would be located, and include a voice-over narration that claims "real ginger, real taste." An example of

such an advertisement that Defendants aired throughout the United States starting at least as early as 2011 and continuing at least through 2013 can be found on the internet at https://www.youtube.com/watch?v=ST7ZWBNlNYg (last accessed June 29, 2018). Another example of a Jack's Ginger Farm advertisement that Defendants aired throughout the United States starting at least as early as 2013 and continuing through at least 2014 can be found on the internet at https://www.youtube.com/watch?v=WpybPki9kdk (last accessed June 29, 2018). Another example of a Jack's Ginger Farm advertisement that Defendants aired throughout the United States starting at least as early as 2014 and continuing through at least 2016 can be found on the internet at https://www.youtube.com/watch?v=-Y5TowjCdeU (last accessed June 29, 2018).

37.     When the commercials began airing in 2011, DPSG admitted that the purpose of the ads was to "increase awareness of 'Made with Real Ginger' message through TV ad." And, in 2016, when evaluating the last of the Jack's Ginger Farm ads, DPSG admitted that "[t]he Farm has been a proven way to establish our real ginger equity." It was "successful at communicating 'real ginger' message" (*Id.*, p.8), meaning that Canada Dry "is a drink made with real ginger." DPSG also determined that "'Jack's Farm': hit hard on natural, real ginger because of the familiar tug of war/farm setting," and that the "Jacks' Farm' campaign" was successful at reinforcing "Real Ginger equity."

38.     DPSG knew that consumers would see the ads as humorous and nevertheless come to believe that the soda is made using ginger root. When DPSG first contemplated the Jack's Ginger Farm ads, it acknowledged that although "the scene in 'Pull' is so clearly infeasible and comedic", it still "communicates that the product is made with real ginger because it is pulled from the earth."

39.     In short, DPSG's advertising and marketing campaign confirms that DPSG intends to deceive consumers through misrepresentations on the Products' labels.  More specifically, DPSG intends that consumers who read the Products' labels believe that the Products are made using real ginger root.

**D.     DPSG's "Made From Real Ginger" Label Deceives Consumers**

40.     Consumer research shows that the vast majority of consumers understand the phrase "Made from Real Ginger" to mean that Canada Dry is made using ginger root, and not miniscule amounts of a flavor extract.  This research is consistent with how DPSG intended consumers to interpret the phrase. DPSG wanted consumers to think the following after seeing the "Made from Real Ginger" on the label: "This is perfect for me! I can now enjoy a drink that tastes great AND is made with natural healthier ingredients – like REAL ginger." Indeed, as the California Court recognized, "Dr. Pepper's documents show that through its marketing, it orchestrated a change in consumer perceptions." *Jackie Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, Case No. 5:17-cv-00564-NC, ECF 199 at 30

41.     But Canada Dry is not made from real ginger as reasonable consumers understand that phrase, i.e. it is not made using ginger root. Instead, Canada Dry Ginger Ale is made from carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a flavor compound comprised predominately of flavor extracts not derived from ginger, and a miniscule amount of a ginger flavor extract. But Canada Dry's ginger flavor extract is not "real ginger" as reasonable consumers understand that term. It is manufactured in a lab using various chemicals and extraction processes. And, although the flavor extract contains some ginger compounds, the miniscule amount that DPSG uses to make Canada Dry results in less than ***two parts per million*** of any ginger compounds in the final beverage. This microscopic amount of

ginger flavor extract provides none of the health benefits consumers associate with real ginger and even appears to fall below the threshold concentration required to impart any flavor to the beverage.

42.    It is possible to make ginger ales using real ginger root. The traditional method is to brew ginger root in water. Indeed, many smaller craft beverage companies make it that way, as do some of DPSG's mainstream competitors such as Reed's. Reed's, for example, has 17 grams of fresh ginger per 12-ournce bottle. Beverages made this way contain hundreds of more times the amount of ginger compounds than the miniscule amounts in Canada Dry.

43.    DPSG does not disclose on the product labels that the Products are flavored using "natural flavor" compounds comprised mainly of non-ginger derived flavor extracts and a tiny amount of a ginger derived flavor extract, rather than using real ginger root, as the product label leads people to believe. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of DPSG's labeling claims, especially at the point of sale. Consumers would not know the true nature of the ginger flavoring merely by reading the ingredient label; its discovery requires investigation beyond the grocery store and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that the flavor in the soft drink is not a result of it being made using ginger root, but instead from a blend of various flavor extracts. That, combined with DPSG's active concealment in representing the Products as being "MADE FROM REAL GINGER," and not disclosing otherwise, gave the average reasonable consumer no reason to suspect that DPSG's representations on the packages were not true, and therefore consumers had no reason to investigate whether the soft drinks contained real ginger.  Thus, reasonable consumers relied on DPSG's representations regarding the nature of the Products. Such reliance by consumers is also

eminently reasonable, since food companies are prohibited from making false or misleading statements on their products under federal law.

44.     DPSG intends and knows that consumers will and do rely upon product labels in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the "MADE FROM REAL GINGER" claim. Indeed, DPSG's own marketing research shows that the claim was highly material to consumers, drove sales throughout the class period, and continues to drive sales today.

**E.     Consumers Seek Out and Pay a Premium for "Real Ginger" Ginger Ales**

45.     DPSG has falsely marketed Canada Dry as "Made from Real Ginger" because that misrepresentation inflates Canada Dry's price and drives sales. As noted above, DPSG's own documents show that Canada Dry sales growth has increased dramatically ever since it added "Made from Real Ginger" to the label, despite the overall decline of the CSD category as a whole.

46.     In making the false, misleading, and deceptive representations, DPSG distinguishes Canada Dry from its competitors' products. Indeed, DPSG referred to "real ginger" as its major "point of difference" from other ginger ales.  DPSG knew and intended that consumers would purchase, and pay a premium for, ginger ales labeled as being made from "REAL GINGER," over comparable ginger ales that do not contain these representations on the product labels. By using this branding strategy, DPSG is representing that its ginger ales are superior to, better than, and more nutritious and healthful than other brands of ginger ales that do not proclaim to be made from "REAL GINGER." For example, other brands of ginger ales that

do not contain the false, misleading, and deceptive representation that they are made from "REAL GINGER," include brands such as Dr. Brown's and Vernors.

47.     Further, DPSG knew and intended their representations to help them compete with small batch bottling companies that do make ginger ales from real ginger. DPSG added the "MADE FROM REAL GINGER" representation to its product labels to compete with such small batch bottling companies that have increased in popularity in recent years. For example, Bruce Cost Ginger Ale is made with fresh whole ginger root and represents this fact to consumers in its advertising and on its product packaging.

48.     Because consumers pay a price premium for products made from real ginger, by labeling Canada Dry as being made from real ginger without actually using the expensive ingredient, DPSG is able to both increase its sales and retain more in profits.

49.     DPSG engaged in the practices complained of herein to further its private interests of: (i) increasing sales of Canada Dry, while decreasing the sales of ginger ales that do not claim to be made from real ginger and those ginger ales that are truthfully offered as made from real ginger by DPSG's competitors, and/or (ii) commanding a higher price for Canada Dry because consumers will pay more for these soft drinks due to the consumers' demand for products containing real ginger because of the perceived benefits. DPSG knowingly and intentionally orchestrated a change in consumer perceptions about Canada Dry through its deceptive labels and advertisements solely to increase its own profits.

### F.     Plaintiff Fletcher's Experiences

50.     Plaintiff Fletcher has purchased Canada Dry on numerous occasions within New York over the past four years. She typically purchased two-liter bottles at the grocery store. She made each of her purchases after reading and relying on the truthfulness of DPSG's product label

that promised the Products were "Made from Real Ginger." Ms. Fletcher believed this meant that Canada Dry was made using ginger root and was, as a result, a healthier alternative to regular sodas. In particular Ms. Fletcher knew that ginger root can calm an upset stomach, and she often purchased Canada Dry for her children were sick, believing that the ginger root in the beverage would soothe their stomach aches.

51.     At the time of each purchase of Canada Dry, Ms. Fletcher did not know that the Products that she purchased were not made from real ginger, but were instead made from a miniscule amount of a ginger flavor extract, which does not contain any of the health benefits of real ginger. As a result of DPSG's misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Ms. Fletcher. As a result of DPSG's misrepresentations and omissions, Ms. Fletcher was injured by paying more money for Canada Dry that she would have paid. Indeed, had DPSG not mispresented the true nature of Canada Dry, Ms. Fletcher would not have purchased Canada Dry or would have paid a lower price for it.

52.     Ms. Fletcher continues to desire to purchase ginger ale made from real ginger, including brands marketed and sold by DPSG. If DPSG's Products were reformulated to be made from real ginger, i.e., made using ginger root, Ms. Fletcher would likely purchase DPSG's Products again in the future. Ms. Fletcher regularly visit stores where DPSG's Products and other ginger ale beverages are sold. Because Ms. Fletcher does not know the formula for DPSG's Products and cannot test whether or not the beverages are made using ginger root before purchasing, Ms. Fletcher will be unable to rely on DPSG's labels when shopping for ginger ales in the future absent an injunction that prohibits DPSG from labeling its Products with the phrase "MADE FROM REAL GINGER" unless the product is actually made using ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market,

Ms. Fletcher cannot know at any given time, which brands are owned by DPSG and whether its representations about "real ginger" are truthful. Thus, Ms. Fletcher is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should DPSG begin to market and sell a new brand of ginger ale, Ms. Fletcher could be at risk for buying another one of DPSG's Products in reliance on the same or similar misrepresentation.

## CLASS ALLEGATIONS

53.    Plaintiff Fletcher brings this action against DPSG, on behalf of herself and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiff seeks to represent the following groups of similarly situated persons, defined as follows:

> All persons who, between June 29, 2014 and the present, purchased in the state of New York, any of DPSG's Products (the "Class")

54.    Plaintiff Fletcher and members of the Class have been economically damaged by their purchase of Canada Dry because the advertising for Canada Dry was and is untrue and/or misleading under New York law; therefore, Canada Dry is worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

55.    As a direct and proximate result of DPSG's unfair and wrongful conduct, as set forth herein, Plaintiff and the class members: (1) were misled into purchasing Canada Dry; (2) received a product that failed to meet their reasonable expectations and DPSG's promises; (3) paid a premium sum of money for a product that was not as represented and, thus, were deprived of the benefit of the bargain because the purchased ginger ale had less value than what was

represented by DPSG; and (4) ingested a substance that was other than what was represented by DPSG and that Plaintiff and class members did not expect.

56.     This action is properly brought and may be maintained as a class action because it satisfies all of the prerequisites of Rule 23.

57.     Numerosity: Plaintiff does not know the exact size of the class, but it far exceeds 100 persons.  New York is within DPSG's "heartland" for sales and Boston, in particular, is the top city for sales of Canada Dry in the country.

58.     Typicality: Plaintiff Fletcher is typical of the class because she was subject to the fraudulent scheme of DPSG as every other class member. She purchased Canada Dry based on DPSG's false representation that it was "Made from Real Ginger." She, like all other class members, paid a premium as a result of that misrepresentation and suffered economic injury as a result. Thus, Plaintiff and the class members sustained the same injuries and damages arising out of DPSG's conduct in violation of the law.  The injuries and damages of each class member were caused directly by DPSG's wrongful conduct in violation of law as alleged.

59.     Adequacy:  Plaintiff will fairly and adequately protect the interests of all class members because it is in her best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which she complains.  Plaintiff has no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and that of the class. By prevailing on her own claims, Plaintiff will establish DPSG's liability to all class members.  Plaintiff and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their

fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

60.    <u>Commonality and Predominance</u>: This action involves common questions the common answers of which will drive the resolution of this case for all class members because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that Canada Dry was made using ginger root. DPSG's product label was the same on all Canada Dry products throughout the class period. Its formula likewise remained unchanged. Thus, all of the central issues in this case will be resolved via common proof for all class members, establishing that common issues predominate over any individual issues. The questions of law and fact common to the Class are:

a)    whether the Products are "MADE FROM REAL GINGER;"

b)    whether Defendants unfairly, unlawfully and/or deceptively misrepresented that the Products are "MADE FROM REAL GINGER;"

c)    whether the use of the phrase "MADE FROM REAL GINGER" on the primary display panel of the Products violated Federal and/or California state law;

d)    whether the advertising of the product as MADE FROM REAL GINGER causes it to command a premium in the market as compared with similar products that do not make such a claim;

e)    whether Defendants' advertising and marketing regarding the Products sold to the class members was likely to deceive the class members and/or was unfair;

f)    Whether a "MADE FROM REAL GINGER" claim on product packaging

and advertising is material to a reasonable consumer;

g)      whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

h)      the amount of profits and revenues earned by Defendants as a result of the conduct;

i)      whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j)      whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

61.      <u>Superiority</u>: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for DPSG and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

62.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## PLAINTIFF'S FIRST CAUSE OF ACTION
### (Common Law Fraud, Deceit and/or Misrepresentation)

63.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

64.     Throughout the last four years, DPSG fraudulently and deceptively informed Plaintiff and class members that Canada Dry was "MADE FROM REAL GINGER." But DPSG failed to inform Plaintiff and class members that Canada Dry was not made from real ginger but was instead made from a flavoring compound composed predominately of flavor extracts not derived from ginger, and a miniscule amount of a ginger flavor extract, which was present in quantities too small to impart flavor to the beverage or provide any health benefits.

65.     These misrepresentations and omissions were known exclusively to, and actively concealed by, DPSG, not reasonably known or knoweable to Plaintiff or class members, and material at the time they were made. DPSG knew the composition of Canada Dry and knew that the soft drinks were made using only miniscule amounts of a ginger flavour extract, not ginger root. DPSG intended to deceive consumers through its product label into believing that the product was made using ginger root when they knew it was not, as the misrepresentation is made prominently on the front of Canada Dry's label, and reinforced through DPSG's national advertising and messaging program.

66.     DPSG's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and class members as to whether to purchase Canada Dry.  In misleading Plaintiff DPSG breached its duty to him and class members. DPSG also gained financially from, and as a result of, their breach.

67.     Plaintiff and those similarly situated relied to their detriment on DPSG's misrepresentations and fraudulent omissions.  Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

68.     By and through such fraud, deceit, misrepresentations and/or omissions, DPSG intended to induce Plaintiff and those similarly situated to alter their position to their detriment. Specifically, DPSG fraudulently and deceptively induced Plaintiff and those similarly situated to, without limitation, purchase the Products.

69.     Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by DPSG.

70.     As a direct and proximate result of DPSG's misrepresentations and/or omissions, Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

71.     DPSG's conduct as described herein was wilful and malicious and was designed to maximize DPSG's profits even though DPSG knew that it would cause loss and harm to Plaintiff and those similarly situated.

**PLAINTIFF'S SECOND CAUSE OF ACTION**
**(Breach of Express Warranty)**

72.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

73.     Under New York law, any affirmation of fact or promise made by the seller or manufacturer to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

74.     Under New York law, any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

75.     DPSG's representation that Canada Dry is "Made from Real Ginger" is an affirmation of fact or promise or that the Product is made using ginger root and contains more than miniscule amounts of ginger, and became part of the basis of the bargain to purchase the Product, creating an express warranty. In the alternative, the representation is a description of a good, which was made as part of the basis of the bargain to purchase the Product, and which created an express warranty that the Product would conform to the Product description.

76.     Plaintiff and class members reasonably and justifiably relied on the foregoing express warranty, believing that the Product did in fact conform to the warranty.

77.     DPSG breaches these express warranties because Canada Dry was not made using ginger root, and contained only miniscule amounts of a ginger flavor extract, which was insufficient to impart a detectable ginger flavor or any of the health benefits consumers associate with ginger root. DPSG knew that its express promise was false, but intentionally misled consumers anyway. DPSG has, as a result, breached its express warranty.

78.     DPSG's breach of its express warranties damaged Plaintiff and those similarly situated. Were it not for Defendants' false affirmations, promises, and descriptions of Canada Dry, Plaintiff and those similarly situated would have acted differently by, without limitation, not purchasing (or paying less for) Canada Dry. DPSG damaged Plaintiff and members of the class in an amount to be determined at trial.

## PLAINTIFF'S THIRD CAUSE OF ACTION
### (Breach of Implied Warranty)

79.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

80.     Under New York law, a warranty that goods are merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. The warranty of merchantability extends to the end user (i.e., the consumer) of the products.

81.     As the manufacturer, DPSG is a merchant with respect to all sales of Canada Dry. Under the law a warranty of merchantability is implied in every contract for the sale of Canada Dry, including the sales to Plaintiff and class members.

82.     Under New York law, merchantable goods must be adequately contained, packaged, and labeled as the agreement may require; and must also conform to the promises or affirmations of fact made on the container or label.

83.     Canada Dry was not adequately contained, packaged, or labeled as required for its sale to Plaintiff and those similarly situated required. In particular, DPSG's representations required that Canada Dry be "Made from Real Ginger" but Canada Dry is not "Made from Real Ginger" as it is made only from miniscule amounts of a ginger flavor extract, not ginger root.

84.     DPSG representation on the principal display panel of every Canada Dry product that Canada dry was "Made from Real Ginger," is also a promise or affirmation of fact to Plaintiff and class members.

85.     However, Canada Dry does not conform to DPSG's promises and affirmations of fact because it is not made using ginger root, and contains less than two parts per million of ginger in the final beverage, an amount apparently below the threshold for a human to taste.

86.     DPSG knowingly and intentionally breached its implied warranty of merchantability for Canada Dry.

87.     Had Plaintiff and class members known that Canada Dry does not conform to DPSG's representations, they would not have purchased Canada Dry or would have, at

minimum, paid less for the product. As a direct and proximate result of DPSG's breach of warranty, Plaintiff and members of the class have been injured in an amount to be determined at trial.

## PLAINTIFF'S FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

88.     Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

89.     DPSG falsely represented to Plaintiff and those similarly situated that Canada Dry is "Made from Real Ginger."

90.     Whether or not Canada Dry is "Made from Real Ginger" was material to the decision of Plaintiff and those similarly situated to purchase Canada Dry. Had Plaintiff and those similarly situated known that Canada Dry is not made using ginger root, but a miniscule amount of a ginger flavor extract, they would have acted differently by, without limitation, not purchasing (or paying less for) Canada Dry.

91.     Plaintiff and those similarly situated were unaware of the falsity of DPSG's representations, and justifiably relied on them in purchasing Canada Dry.

92.     Due to their justifiable reliance on DPSG's misrepresentations, Plaintiff and those similarly situated suffered pecuniary loss.

## PLAINTIFF'S FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

93.     Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

94.     As a result of DPSG's unlawful and deceptive actions with respect to Canada Dry's "Made from Real Ginger" representation described above, DPSG was enriched at the

expense of Plaintiff and those similarly situated through their payment of monies to obtain

Canada Dry.

95.     Under the circumstances, it would be contrary to equity and good conscience to

permit DPSG to retain the ill-gotten benefits they received from Plaintiff and those similarly

situated.

96.     By reason of the foregoing, Plaintiff and those similarly situated were damaged in

the amount they paid to obtain Canada Dry.

## PLAINTIFF'S SIXTH CAUSE OF ACTION
### (Violation of NYGBL § 349)

97.     Plaintiff realleges and incorporates the above paragraphs of this Complaint as if

fully set forth herein.

98.     NYGBL § 349 provides: "Deceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state are hereby declared

unlawful."

99.     DPSG's Canada Dry label, as well as its marketing and advertising for Canada

Dry are consumer oriented. DPSG engaged in deceptive practices within the meaning of NYGBL

§ 349 by representing and marketing Canada Dry as being "Made from Real Ginger," which

reasonable consumers believe means Canada Dry is made using ginger root. As explained more

fully above, however, it is not made using ginger root.

100.     Whether or not Canada Dry is "Made from Real Ginger" was material to the

decision of Plaintiff and those similarly situated to purchase Canada Dry. Had Plaintiff and those

similarly situated known that Canada Dry is not made using ginger root, but a miniscule amount

of a ginger flavor extract, they would have acted differently by, without limitation, not

purchasing (or paying less for) Canada Dry

101.    DPSG has violated NYGBL § 349 and, as a consequence, Plaintiff and members

of the class have been injured and suffered damages in an amount to be proved at trial.

### PLAINTIFF'S SIXTH CAUSE OF ACTION
### (Violation of NYGBL §§ 350 and 350-a)

102.    Plaintiff realleges and incorporates the above paragraphs of this Complaint as if

fully set forth herein.

103.    NYGBL § 350 provides: "False advertising in the conduct of any business, trade

or commerce or in the furnishing of any service in this state are hereby declared unlawful."

NYGBL § 350-a further provides that "'false advertising' means advertising, including labeling,

of a commodity . . . if such advertising is misleading in a material respect."

104.    DPSG's Canada Dry label, as well as its marketing and advertising for Canada

Dry are consumer oriented. DPSG engaged in deceptive practices within the meaning of NYGBL

§ 350 by representing and marketing Canada Dry as being "Made from Real Ginger," which

reasonable consumers believe means Canada Dry is made using ginger root. As explained more

fully above, however, it is not made using ginger root.

105.    Whether or not Canada Dry is "Made from Real Ginger" was material to the

decision of Plaintiff and those similarly situated to purchase Canada Dry. Had Plaintiff and those

similarly situated known that Canada Dry is not made using ginger root, but a miniscule amount

of a ginger flavor extract, they would have acted differently by, without limitation, not

purchasing (or paying less for) Canada Dry

106.    DPSG has violated NYGBL § 350 and, as a consequence, Plaintiff and members

of the class have been injured and suffered damages in an amount to be proved at trial.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and those similarly situated, respectfully

requests that the Court enter judgment against DPSG as follows:

A.  Certification of the proposed New York Class, including appointment of Plaintiff's counsel as class counsel;

B.  An order temporarily and permanently enjoining DPSG from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.  An award of compensatory damages in an amount to be determined at trial;

D.  An award of punitive damages in an amount to be determined at trial;

E.  An award of statutory damages in an amount to be determined at trial;

F.  An award of restitution in an amount to be determined at trial;

G.  An order requiring DPSG to pay both pre- and post-judgment interest on any amounts awarded;

H.  For reasonable attorney's fees and the costs of suit incurred;

I.  For such further relief as this Court may deem just and proper;

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury as to all issues.


Dated:  July 10, 2018                           **DEBENEDICTIS & DEBENEDICIS LLC**

                                                /s/ Michael J. DeBenedictis
                                                Michael J. DeBenedictis, Esq.

                                                    -and-


                                                Seth Safier, Esq.  (not yet admitted)
                                                Matthew T. McCrary, Esq. (not yet admitted)
                                                **GUTRIDE SAFIER LLP**
                                                100 Pine Street
                                                Suite 1250
                                                San Francisco, CA 94111